No. 47,912

STATE OF KANSAS, *Appellee,* v. HAROLD CLARK, JR., *Appellant.*

(544 P. 2d 1372)

Opinion filed January 24, 1976.

*Edward G. Collister, Jr.,* of Lawrence, argued the cause and was on the brief for the appellant.

*David Berkowitz,* county attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Gregory Justis,* legal intern, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Harold Clark, Jr., was charged with the crimes of burglary, aggravated sodomy, rape and possession of marihuana with intent to sell. He was convicted by a jury of rape and simple possession of marihuana and acquitted of the burglary charge. The jury failed to agree on the sodomy charge and mistrial was declared as to it. Clark appeals from the sentences imposed for the rape and marihuana offenses.

Appellant, a nineteen year old black male weighing about 270 pounds, is a former student at Kansas University who resided in Columbia, South Carolina, in April, 1974. In the forepart of that month he traveled with two other persons to Lawrence in a sky-blue Continental Mark IV. On April 9, 1974, the trio visited friends at Ellsworth dormitory at least twice, including one time between 11:00 p. m. and midnight when they signed in as guests of a person named Bernside. After that visit they left the dorm with a friend and went to a party at a private apartment.

The victim of the rape, a white girl who was five feet two inches tall and weighed 105 pounds, lived alone on the tenth floor of Ells-

worth Hall. On April 10, 1974, she went to bed at about 1:00 a. m. without locking the door. Meanwhile, at about 3:00 a. m., appellant entered the room of a young woman who lived down the hall from the rape victim. A conversation ensued which frightened her. Appellant left her room and went in the direction of the victim's room. This woman saw appellant's car leave at about 3:30 a. m. the same morning. At about 3:15 a. m. the victim was awakened when her door was opened. She noticed the hand of a black male on the doorknob but thought it was her boyfriend, who was black and lived in another wing of the dormitory. She arose and upon fully opening the door was confronted by appellant who blocked her exit, pushed her aside and entered the room. The room was dark except for light filtering in through the venetian blinds but she did get a good look at appellant while he was standing under the hall light. Appellant had a silver colored pistol in his hand which he cocked and pointed at the victim. He told her she had better please him or he would use the gun. Appellant first told her to perform fellatio upon him, which she did. Appellant then raped her and left the room.

At this point in the narrative it may be well to consider one complaint raised upon appeal. Appellant asserts a submissible case of rape was not presented by reason of certain admissions made by the victim. She testified that after appellant had demanded that sodomy be committed she asked if he wasn't going to rape her first; her reason for this statement was that the act he wanted performed on him was disgusting to her and she believed "if he was going to rape me that I would rather he got it over with, that I didn't have to do anything else". She further testified he still had the gun pointed at her at this time, he had threatened to kill her, she was afraid, did not want to be raped and did not consent to it but perferred rape to the other act; she did not scream or struggle because she feared appellant would kill her with the gun.

Rape is an act of sexual intercourse committed by a man with a women not his wife without her consent and when the woman's resistance has been overcome by force or fear (K. S. A. 21-3502). Here a cocked handgun was pointed at the victim with explicit threats of harm if the assailant's demands were not met. She testified the intercourse occurred without her consent and at a time when she feared for her life. She did make immediate complaint after appellant left. Under these circumstances the victim's state-

ment concerning rape cannot be held as a matter of law to imply consent on her part. The evidence clearly presented a submissible case for jury determination (see *State v. Hampton,* 215 Kan. 907, 529 P. 2d 127).

Immediately after the incident the victim telephoned her boyfriend. He arrived at her room in two or three minutes. The two then went to the resident dorm director and reported the incident. Lieutenant Welliver and Officer Skeet, members of the university traffic and security department, came to the dorm and talked to the victim and to dorm personnel. The victim described her assailant as a black man, about five feet eight inches tall, over 200 pounds, very heavy, with a short or medium Afro haircut and a beard along the jawline (later she was not positive about the beard since she had no recollection of it scratching her face). The victim then went to the hospital for examination. A doorman at the dorm told the officers that a person fitting the general description of the assailant had recently left the dorm and entered a blue Continental automobile. Officer Skeet knew that appellant had been driving a blue Continental and that he matched the description of the assailant. Lt. Welliver then relayed to the university security dispatcher information of the incident, including the significance of the blue Continental. He described the assailant as a heavy-set black male with a full beard and approximately five feet eight inches or five feet ten inches tall, and asked that appellant and the car be picked up and held. The dispatcher in turn informed Sergeant Monroe, a university security investigator, of the situation. Lt. Welliver also discussed the case over the radio with Sgt. Monroe. Monroe went to the hospital and interviewed the victim. She described her assailant. Sgt. Monroe had previously known appellant and knew he was in Lawrence driving a blue Continental with South Carolina license plates. Appellant had at that time been under surveillance by both university and city police for possible drug trafficking. Monroe regarded appellant as a suspect in the rape incident since he fit the description given, and he notified the Lawrence police dispatcher he wanted appellant located and held on a pickup order for questioning.

The Lawrence police dispatcher promptly broadcast the pickup request for a black male, five feet eight inches to five feet ten inches in heighth, weighing approximately 260 pounds and driving a light blue Continental bearing South Carolina tag AHN203. A Lawrence

patrolman on duty that night, Officer Fitzpatrick, heard the broadcast and radioed his superior, Corporal Othick, that the suspect had been under police surveillance and he knew the suspect was in a particular room at a local motel. A group of Lawrence police officers, including Fitzpatrick and headed by Cpl. Othick, then converged on the motel, arriving there at about 4:10 a. m. The officers spent several minutes evacuating guests on either side of appellant's room, then entered his room and arrested him for rape. They searched him and the room and seized several incriminating items, including a .38 caliber pistol, some .45 caliber shells matching others found on the victim's bed and several "baggies" of marihuana. It was stipulated these items were seized as an incident to appellant's arrest. Prior to trial appellant moved to suppress this evidence, as well as other evidence seized later under a search warrant. This other evidence included a .45 caliber chrome automatic found in appellant's Continental and his shorts in which were found pubic hairs microscopically matching those of the rape victim. The motion was overruled and all the challenged evidence was received over appellant's continuing objection.

Appellant contends the search of his person and room was unlawful because his arrest was warrantless and not based on probable cause. Concededly the arrest and initial seizure were without benefit of warrant. Essentially, appellant makes three arguments. He says there was no occasion for precipitous action by the officers and an arrest warrant should have been secured before bursting in on him, the request relayed to the arresting party was to locate appellant and not to arrest him, and in any event the arresting officers had no probable cause to make an arrest for rape. In considering these contentions a brief review of applicable principles is in order. "Under the Fourth and Fourteenth Amendments to the United States Constitution, a search conducted without a warrant issued upon probable cause is 'per se' unreasonable, subject only to a few specifically established and well-delineated exceptions" (*State v. Schur*, 217 Kan. 741, 538 P. 2d 689, Syl. ¶ 1). One of these exceptions is a search incident to a lawful arrest (*State v. Tygart*, 215 Kan. 409, 524 P. 2d 753). If a warrantless arrest is challenged by a defendant the burden is on the state to justify it as not only authorized by statute but as permissible under the fourth amendment to the federal constitution (*State v. Boster*, 217 Kan. 618, 539 P. 2d 294; K. S. A. 22-3216). The constitutional validity of a warrantless arrest depends upon whether the arresting

officer had probable cause to believe that the person arrested had committed a felony. "Probable cause, to believe that a person has committed a felony to justify an arrest of such person by a law enforcement officer under the provisions of K. S. A. 22-2401 (c) (1), refers to that quantum of evidence which would lead a prudent man to believe that an offense has been committed. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove guilt is more probable than not. It is only necessary the evidence lead the officer to believe that guilt is more than a possibility, and it is well-established that the belief may be predicated in part upon hearsay information" (*State v. Curtis*, 217 Kan. 717, 538 P. 2d 1383, Syl. ¶ 1; see also *State v. Lamb*, 209 Kan. 453, 497 P. 2d 275).

It is well-established that the collective information of police officers and law enforcement officers involved in an arrest can form the basis for probable cause, even though that information is not within the knowledge of the arresting officer (*Smith v. United States*, 358 F. 2d 833). The knowledge or information of the arresting officer at the time of arrest is relevant only where an arrest is predicated on that officer's personal observations and information concerning the criminal act. In other situations ". . . The correct test is whether a warrant if sought *could have* been obtained by law enforcement agency application which disclosed its corporate information, not whether any one particular officer could have obtained it on what information he individually possessed" (Ibid. p. 835). In *Smith* the court compared the bits and pieces of information within the knowledge of separate police officers or agencies as layers in a laminated total of collective information. ". . . As we have often observed, probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total" (Ibid. p. 837).

The information upon which a determination to arrest without a warrant is made must be reasonably reliable, and the chain of communication through which facts known to the police are received must be constructed with reliable links from its source to the resulting arrest; this chain of communication must be reliably cohesive from a reliable source to the resulting arrest (*United States v. Dento*, 382 F. 2d 361, cert. den., 389 U. S. 944, 19 L. ed. 2d 299, 88 S. Ct. 307; rehearing den. 389 U. S. 997, 19 L. ed. 2d 502, 88

S. Ct. 493). "There is no requirement that the arresting officer have sufficient firsthand knowledge to constitute probable cause. It is enough that the police officer initiating the chain of communication either had firsthand knowledge or received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth" (*Daniels v. United States*, 393 F. 2d 359, 361). Therefore, when an arrest is based on a message relayed over police radio, the question of probable cause is determined upon the full information which caused the message to be sent over the radio and not on the basis of the message alone (see *State v. Dearman*, 203 Kan. 94, 453 P. 2d 7). If it later turns out that the officer or agency initiating the chain of communication did not have probable cause to make an arrest, the arrest made by the officer relying on the radio message will be unlawful (*Whiteley v. Warden*, 401 U. S. 560, 28 L. ed. 2d 306, 91 S. Ct. 1031).

In a cooperative investigation by many police officers, the knowledge of one officer is the knowledge of all in determining probable cause for an arrest, provided there has been communication between the individual officers (*State v. Pokini*, 45 Hawaii 295, 367 P. 2d 499). The "fellow officer" rule as applicable to police radio dispatched information was summarized in *People v. Hamilton*, _____ Colo. _____, 533 P. 2d 919, in this fashion:

". . . An arresting officer who does not have in his possession sufficient information to constitute probable cause may, however, make a valid warrantless arrest if (1) it is shown that he acted upon the direction or as a result of a communication from a fellow officer or a communication from another police department and (2) it is shown that the police, as a whole, were in possession of information sufficient to constitute probable cause." (p. 920, 533 P. 2d.)

In applying these principles to the case at bar it may be well to recapitulate briefly the facts and information available to the various officers and the communication between them. Lt. Welliver and Officer Skeet of the university security department interviewed the victim shortly after the alleged offense, secured a description of the assailant and learned of appellant's earlier presence at the dorm, as well as the later exit into the blue Continental of a person matching the assailant's description. Sgt. Monroe's subsequent investigation confirmed and revealed these same facts. These officers had a previous acquaintance with appellant and his car. Thus the lines of communication started from the victim to Lt. Welliver and Officer Skeet, from them to the university security dispatcher, then

the dispatcher to Sgt. Monroe, who received information from the victim at the hospital and also talked by radio with Lt. Welliver about the case; Monroe then communicated with the Lawrence police dispatcher and this agency broadcast a message received by Officer Kirkpatrick and Cpl. Othick who participated in appellant's arrest.

Appellant contends the information that he had been at Ellsworth Hall that evening, that a person matching his description had left the dorm shortly after the crime was committed and that a car matching the description of appellant's had been parked outside the dorm when the crime occurred cannot be used to establish probable cause to arrest appellant because it was never communicated directly from Lt. Welliver to Sgt. Monroe. It is true Monroe testified he did not talk to Welliver that morning. However, it is also true that Welliver testified he did talk with Monroe over the university radio system on the particular occasion and discussed the case. The trial court heard this evidence and ruled that the arrest was made on probable cause, thus resolving any evidentiary conflict in favor of the prosecution. Beyond this Lt. Welliver communicated his observations and knowledge to the university dispatcher who in turn contacted Sgt. Monroe. This broadened chain of communication of events went to the Lawrence police dispatcher, then to the arresting officers. Appellant's analysis focuses too technically and narrowly on the chain of communication and ignores the collective information possessed by the university security personnel. There was communication among them and they were cooperating in a coordinated investigation of an alleged crime. Even though every link or officer in the chain may not have had all the information available about appellant or the crime, the chain itself was reliable and cohesive.

Appellant's argument that an arrest warrant should have been secured from a magistrate overlooks two factors which may come into play in determining whether police conduct in making a warrantless arrest is reasonable. The first is the seriousness of the alleged offense, discussed in 1 Restatement of Torts 2d, § 119, (b) Comment j, as follows:

". . . The nature of the crime committed or feared, the chance of the escape of the one suspected, the harm to others to be anticipated if he escapes, and the harm to him if he is arrested, are important factors to be considered in determining whether the actor's suspicion is sufficiently reasonable to confer upon him the privilege to make the [warrantless] arrest." (p. 198.)

The second is the exigency of the situation, as where an immediate arrest seems desirable because a suspect is likely to flee the jurisdiction or is thought to be in possession of vital evidence of the crime (see *Carroll v. United States,* 267 U. S. 132, 69 L. ed. 543, 45 S. Ct. 280, 39 ALR 790, and *United States v. Wright,* 449 F. 2d 1355). Here serious crimes allegedly had been committed, and with aid of a handgun. Appellant was known to be a transient. Thus the officers were faced with the likelihood of the suspect's departure along with any evidence of the offense and we cannot say they acted unreasonably in effecting an immediate arrest.

Appellant further complains that Cpl. Othick's testimony indicated that the police broadcast message was to locate appellant for questioning, the inference being he was not to be arrested. This officer's articulation as a witness of the background for the arrest is not necessarily controlling. Both Lt. Welliver and Sgt. Monroe had asked that appellant be picked up and held for questioning. The situation was similar to that in *State v. Dearman,* supra, where a suspect was arrested as a result of a pickup order dispatched over police radio and an ensuing search was held to be proper. Here the objective facts available collectively to the officers were sufficient for the Lawrence police to effect the warrantless arrest. Our holding is there was probable cause for that arrest. Consequently the trial court properly ruled that the items taken from appellant's person and motel room were lawfully seized as an incident to his arrest.

Shortly after his arrest appellant was photographed by police and his picture, along with photographs of seven other black males, was used for a photographic lineup shown later to the victim on April 10. At this lineup the victim positively selected appellant's picture as that of her assailant after viewing them all for about ten seconds. At this time appellant had retained an attorney, whose request to be present during the picture identification session was denied. Appellant's objections that this denial violated his constitutional right to counsel were overruled prior to and during the trial and he renews them here. The trial court ruled properly. In *United States v. Ash,* 413 U. S. 300, 37 L. ed. 2d 619, 93 S. Ct. 2568, it was held that the sixth amendment to the federal constitution does not grant the right to counsel at post-indictment photographic displays conducted by government for the purpose of allowing a witness to attempt identification of an offender.

Appellant further complains that the photographic display was impermissively subjective in that appellant was the only heavy set person in the group not wearing glasses. Lineups that are unnecessarily suggestive or conducive to irreparable mistaken identification are forbidden by the due process clauses of the federal constitution (*State v. Colin*, 214 Kan. 193, 519 P. 2d 629). We have examined the photographs. They portray youthful appearing black males, all with varying amounts of facial hair and with short to medium Afro haircuts. The lower portions of the pictures were covered so that only the head, neck and upper part of the shoulders of the individuals appeared, with the result the body types were virtually obscured. Six of the pictures portrayed persons without glasses. We cannot say the photographic display, held shortly after the commission of the alleged offense, was improper in any way.

The judgment is affirmed.

APPROVED BY THE COURT.