No. 52,613

STATE OF KANSAS, *Appellee,* v. PHILIP ANTHONY NIBLOCK, *Appellant.*

(631 P.2d 661)

Opinion filed July 17, 1981.

*Harold T. McCubbin,* of Harold T. McCubbin, Chartered, of Norton, argued the cause and was on the brief for the appellant.

*Rod Ludwig,* county attorney, argued the cause and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an appeal by Philip Anthony Niblock from his jury conviction of aggravated robbery (K.S.A. 21-3427), felony theft (K.S.A. 1980 Supp. 21-3701), aggravated assault (K.S.A. 21-3410), and unlawful possession of a firearm (K.S.A. 21-4204). His conviction is the result of a tavern robbery in Beloit.

April 29, 1980, was a routine evening in Rex Smoker, a beer tavern in Beloit. Marilyn Wendell had relieved Mike Wagner, the owner, at 6:00 p.m. as bartender. The usual customers came and went throughout the evening. She took in approximately $150 that evening. The customers were, for the most part, local people. By 11:30 p.m. everyone had left the tavern except four persons and Marilyn started stocking the cooler for the next day's business. After the last customer left, Marilyn closed the tavern at midnight. She took the coins and bills from the cash register, put them in a bag, and departed by the front door, locking it behind her. The bag contained approximately $500 after Marilyn took out her salary. She started for her car intending to deposit the money in the bank's night depository, then go home. Her car was parked on the east side of the tavern in the bank parking lot. As she approached the car, she saw a person standing in the shadows in front of her car. The person walked toward her and demanded the

money. Ms. Wendell thought the voice was familiar but she was unable to recognize the man because he wore a mask made of what appeared to be long underwear with holes for eyes. Marilyn continued walking toward the car and retorted, "You don't want this money." She pretended she thought he was joking and walked on to the driver's side of the car. The robber followed her, pointing a gun at her. Marilyn then coolly asked her assailant to turn the gun so she could see if it was real. Her assailant said he would show her it was real if she didn't give him the money. She relinquished the money bag to him. Her delay had given her time to observe the robber. He had on the mask, a burgundy hooded sweatshirt, faded blue jeans, a plaid flannel shirt and dirty, laced workboots.

After the robber received the money he told Marilyn not to do anything and ran south toward the alley, then turned west. She immediately got in her car and drove to the Law Enforcement Center. It was 12:13 a.m. She related the entire episode with descriptions to Randy Paxson, the dispatcher, and to policeman Roger Terry. Terry left immediately to search for the robber. Paxson notified the other officers and the investigation began. Marilyn Wendell remained at the L.E.C. for an hour or so.

Kevin Koster, deputy sheriff of Mitchell County, was called by Paxson and given the robbery information and a description of the assailant. He started patrolling the downtown area of Beloit in his private car. He saw a truck driver in the alley by the Montgomery Ward store unloading merchandise for the store. Koster stopped and asked whether the driver had seen anyone resembling the robber. The Montgomery Ward store is to the rear and west of the tavern. The driver, Thomas T. Herron, stated he had seen nothing unusual and Koster left the area to continue his investigation. A few minutes later, on reflection, Mr. Herron remembered seeing a blue Roadrunner or Charger with Cragar mag wheels parked on the right-hand side of the alley behind the bank parking lot and he'd never seen it parked there before. He recalled that while he was unloading the truck the dogs in a pen next to the alley started barking loudly. He went out of the building to ascertain the cause and saw the blue car pull out and leave. That was between 12:05 a.m., his time of arrival, and 12:20 a.m., when Officer Koster talked to him. Before he left town, Herron found Leon Lewis, the Mitchell County undersheriff, and

reported this information. Lewis reported the information to Randy Paxson at the L.E.C. where Marilyn Wendell was waiting. When the news of the blue car came over the dispatch, Marilyn Wendell recalled that while she was stocking the cooler for the next day's business, just before midnight, she saw a similar blue car drive slowly by the tavern. She remembered the incident because the car had driven so slowly and the driver had peered intently into the tavern. At 12:45 a.m. the dispatcher put out an "all points bulletin" describing the car and the suspect.

Kenny Bernard, Downs' police chief, was making the rounds in Downs at 12:45 a.m. and heard the part of the broadcast describing the vehicle. He wrote it down and proceeded immediately to a location on U.S. Highway 24 at the north side of Downs. He pulled in at 12:52 a.m. and flipped off his radar in case the suspect's car was equipped with a radar detector. Highway 24 runs east and west between Downs and Beloit, which are 24 miles apart. A few minutes later Bernard heard a vehicle coming from the east with a loud roaring noise. He flipped his radar on and waited for the vehicle. When the vehicle passed Chief Bernard, it was visible under a street light. It was a blue Dodge Coronet with chrome wheels matching the description he received over the radio. Chief Bernard pulled onto the highway behind the vehicle and radioed Osborne that he had the vehicle from Beloit under surveillance, giving the tag number and requesting ownership. He requested assistance from Osborne officers and asked them to set up a roadblock at the junction of U.S. Highways 24 and 281. When Chief Bernard reached that location, he turned on his red light and the vehicle responded by stopping. Osborne County Undersheriff Charles Dollison and Officer Mark Gill from Osborne were waiting at the designated intersection to render assistance. Bernard pulled up behind the blue car and got out of his car. Using his public address system, he told the driver to get out of the car. The driver emerged from the car and placed his hands on the top of the car and spread his legs preparatory for a search. Bernard covered him with a shotgun while Officer Dollison frisked him for a weapon. Gill and Bernard then moved away from behind their car doors. The Beloit dispatcher notified Bernard that Philip Anthony Niblock was the registered owner of the car. The driver produced a driver's license showing he was Philip Anthony Niblock, a resident of Logan. Niblock was wearing a

plaid shirt, faded jeans and some brown, laced boots. He stated he had come to Osborne from Beloit. By this time, Osborne Chief of Police Curtis Minor had arrived at the scene. After a cursory search of the driver's area of the car for weapons, Niblock was given a *Miranda* warning and the officers took him to the Law Enforcement Center in Osborne.

Gary Reiter, Mitchell County Sheriff, arrived at the Osborne L.E.C. around 1:24 a.m. He was immediately taken to the room where Niblock was held. Chief Minor was also present. Reiter introduced himself to Niblock and he and Niblock reviewed a form granting permission to search Niblock's car. He explained to Niblock that he did not have to give permission for the search and if he did not, a search warrant would be obtained. Niblock was also advised he was a suspect and if the search produced nothing he could be on his way. Niblock read the form and signed it at 2:20 a.m.

A search of the interior of the car produced a brown jacket from the rear deck by the back window. The jacket contained a large number of one dollar bills in the right hand pocket and a number of larger bills in the other pocket. The car trunk yielded a .22 caliber silver pistol in a brown case, a burgundy sweatshirt, a mask made from long underwear, and several rolls of coins. The items seized compared favorably with the description given by Ms. Wendell. The appellant was then arrested and charged with aggravated robbery, felony theft, and unlawful possession of a firearm.

The complaint was later amended over appellant's objection to include an additional count of aggravated assault. Appellant filed motions to dismiss and suppress which were overruled. After trial and conviction on all counts on September 11, 1980, he filed a motion for a new trial. Both were overruled and this appeal followed.

Before considering appellant's points on appeal, we would like to point out that the investigation which led to the arrest of the appellant involved numerous law enforcement officers from three cities and two counties as well as from the highway patrol. The officers worked efficiently and diligently to piece together the chain of events following the robbery. The smooth cooperation between each department evidences the professional manner in which they carried out their duties.

Niblock argues the trial court erred in overruling his motion to dismiss and motion to suppress. He argues the initial stop, the arrest and subsequent search conducted by law enforcement officers were not proper pursuant to Fourth Amendment protections under the U. S. Constitution and Section Fifteen of the Bill of Rights in the Kansas Constitution. Appellant contends the evidence was illegally recovered and should have been suppressed. Each of those Fourth Amendment arguments will be discussed separately.

Appellant claims the initial stop by Chief Bernard was improper pursuant to the standards enunciated in *Delaware v. Prouse,* 440 U.S. 648, 59 L.Ed.2d 660, 99 S.Ct. 1391 (1979). *Delaware v. Prouse* is not applicable to this case. There, the defendant's car was the subject of a random stop to check the driver's license and registration. As the officer approached the car, he smelled marijuana and saw marijuana lying in plain view on the floor of the car. The initial stop was not made pursuant to any observation of illegal activity. The court held the stop was unreasonable under the Fourth Amendment stating:

"[E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Delaware v. Prouse,* 440 U.S. at 663.

The stop in the instant case was not made at random merely to check the driver's license and registration. Chief Bernard stopped appellant's car after he was informed that within the hour a robbery had occurred in Beloit. He was given a description of a suspect vehicle and the assailant believed to be driving the vehicle. Both the vehicle and its driver matched that description. An officer must have a reasonable suspicion that a crime has been committed, pursuant to K.S.A. 22-2402(1). That statute was recently discussed in *State v. Hayes,* 3 Kan. App. 2d 517, 519, 597 P.2d 268, *rev. denied* 226 Kan. 793 (1979):

"The stop of a suspect based on reasonable suspicion that a crime has been, is being, or is about to be committed is to be distinguished from an arrest based upon probable cause. The former does not rise to the level of the latter in terms of the degree of criminally suspicious activity required."

See *State v. Boone,* 220 Kan. 758, 556 P.2d 864 (1976); *State v.*

*Morin,* 217 Kan. 646, 650, 538 P.2d 684 (1975); *State v. Kearns,* 211 Kan. 158, 159-160, 505 P.2d 676, *cert. denied* 414 U.S. 841 (1973).

Appellant questions whether Chief Bernard's personal knowledge of the details of the robbery was sufficient to form reasonable suspicion. It is established the knowledge of one peace officer is imputed to fellow officers. *State v. Washington,* 226 Kan. 768, 602 P.2d 1377 (1979). The stopping of Niblock's vehicle was entirely proper.

Appellant next complains his arrest was without a warrant and without probable cause in violation of his rights under the U.S. and Kansas Constitutions and K.S.A. 22-2401. *State v. Coe,* 223 Kan. 153, Syl. ¶ 4, 574 P.2d 929 (1977), states:

"Probable cause for an arrest without a warrant exists when the facts and circumstances known to the arresting officer are sufficient to warrant a man of reasonable caution to believe a crime has been or is being committed."

See *State v. Williams,* 4 Kan. App. 2d 651, 653, 610 P.2d 111 (1980).

"In determining probable cause, all the information in the officer's possession, fair inferences to be drawn therefrom, and observations made by him are generally pertinent, and facts may be considered that would not be admissible on the issue of guilt." *State v. Coe,* 223 Kan. 153, Syl. ¶ 5.

*State v. Clark,* 218 Kan. 726, 731, 544 P.2d 1372, *cert. denied* 426 U.S. 939 (1976), states:

"It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove guilt is more probable than not. It is only necessary the evidence lead the officer to believe that guilt is more than a possibility, and it is well-established that the belief may be predicated in part upon hearsay information."

Two other factors which may come into play in evaluating police conduct in making a warrantless arrest are: the seriousness of the alleged offense and the exigency of the situation, as where immediate arrest seems desirable because of the likelihood that the suspect will flee the jurisdiction. *State v. Clark,* 218 Kan. at 733-34.

This court has, on several occasions, reviewed the sufficiency of evidence to support a showing of probable cause for a warrantless arrest. *State v. Buckner,* 223 Kan. 138, 574 P.2d 918 (1977); *State v. Brocato,* 222 Kan. 201, 563 P.2d 470 (1977); *State v. Clark,* 218 Kan. 726; *State v. Boster,* 4 Kan. App. 2d 355, 606 P.2d 1035 (1980).

Collectively, the officers involved were aware that within a very short time period, the following events occurred: There had been a robbery at the Rex Smoker Tavern by a white male wearing a beige or white mask made from what appeared to be a long underwear shirt with holes cut out for the eyes. The robber wore faded blue jeans, a burgundy hooded sweatshirt, a plaid flannel shirt with blue in it and dirty, brown workboots that laced up. He carried a shiny, silver gun. After he received the money from Marilyn Wendell, he ran off toward the alley where, it was later learned, an unfamiliar blue car with distinctive chrome mag wheels had been parked. Ms. Wendell also remembered seeing a blue car with a jacked-up rear end drive very slowly by the tavern just before closing time. The driver had peered intently into the tavern as he drove by. Shortly after the robbery, the blue car was seen leaving the alley. A blue car matching the description of the one seen in Beloit was later stopped and its driver admitted he had just come from Beloit. The driver's clothing generally matched that of the robber. We find these events formed a basis of probable cause to arrest appellant.

Under the same Fourth Amendment issue, appellant complains the search of his vehicle was based on an illegal, involuntary consent. *State v. Nicholson,* 225 Kan. 418, 423, 590 P.2d 1069 (1979), states:

"The existence and voluntariness of a consent to search and seizure is a question of fact to be decided in light of attendant circumstances by the trier of facts and will not be overturned on appeal unless clearly erroneous. . . . [T]he quantum of evidence necessary to prove voluntariness has been held to be by a preponderance."

The consent must be knowingly and voluntarily given without the presence of threats or coercion. Here, the trial court made specific findings regarding the voluntariness of appellant's consent to search the vehicle. The court found the appellant calmly and forthrightly signed the consent to search form. Appellant was neither coerced nor mistreated by the officers in an effort to obtain consent. Appellant points out several factors which are considered by many courts in evaluating the voluntariness of a consent to search. Those factors, such as the threat to obtain a search warrant, denial of guilt by appellant, the fact appellant was in custody and a display of weapons by officers receive detailed

attention in 2 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2 (1978). Each is merely a factor to be considered in evaluating the overall atmosphere surrounding the giving of consent. The record supports the trial court's findings regarding consent. Our conclusion as to the foregoing issues resolves appellant's allegation that all subsequent evidence was illegally obtained.

Appellant argues the filing of an amended complaint, adding a count to the charges, without a hearing violates K.S.A. 1980 Supp. 22-3201(4), which provides:

"The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced."

The original complaint was filed April 29, 1980. Ten days later, on May 9, 1980, without notice to defendant, an amended complaint was filed adding one count of aggravated assault. K.S.A. 21-3410. Appellant alleges the trial court erred in approving the amended complaint because the approval was done without a court hearing and because the amendment added a different crime. The amendment occurred long before preliminary hearing.

The inquiry under the statute is whether prejudice has occurred to the appellant. *State v. Smith,* 225 Kan. 796, 798, 594 P.2d 218 (1979). "Prior to trial, the prosecution is given wide discretion in amending the information as to form and substance." *State v. Foy,* 227 Kan. 405, 408, 607 P.2d 481 (1980). The statute does not explicitly require that a hearing be held prior to the decision to amend a complaint. The absence of such a hearing is not error. It was not error to allow the prosecutor to add a different crime, and appellant fails to show that he was prejudiced, which he must do in order to obtain reversal on those grounds. See *State v. Johnson,* 223 Kan. 185, 573 P.2d 595 (1977); *State v. Gilley,* 5 Kan. App. 2d 321, 615 P.2d 827, *rev. denied* 228 Kan. 807 (1980); *State v. Wright,* 4 Kan. App. 2d 196, 603 P.2d 1034 (1979), *rev. denied* 227 Kan. 928 (1980).

The addition of the crime of aggravated assault is improper, however, for another reason. Under the facts and circumstances of this case, the aggravated assault and aggravated robbery charges are multiplicitous. We recently reviewed the rules relating to multiplicity in *State v. Garnes,* 229 Kan. 368, 624 P.2d 448 (1981); *State v. Rice,* 227 Kan. 416, 607 P.2d 489 (1980); and *State*

*v. Dorsey,* 224 Kan. 152, 578 P.2d 261 (1978). The facts in this case do not support the charge of both crimes and appellant should not have been charged as such.

Appellant contends the amended complaint was not supported by any record showing probable cause, pursuant to *Wilbanks v. State,* 224 Kan. 66, 579 P.2d 132 (1978). In light of our holding on the prior issue, we need not consider this question.

Finally, Niblock contends the trial court erred in admitting the silver-colored pistol over his objection to the foundation laid for chain of custody. *State v. Nicholson,* 225 Kan. at 421, states:

"As a general rule when objects of physical evidence have been kept in police custody the chain of possession must be reasonably complete but this rule may be relaxed when the object is positively identified at the trial and it is established the object remains unaltered."

The gun was initially offered during the first recall testimony of Chief Daugherty. At that time, appellant objected to the admission of the gun on the grounds of improper foundation. The gun was admitted. On cross-examination of Chief Daugherty's recall testimony, appellant again objected on the basis of foundation and chain of custody. The objection was sustained and the exhibit was withdrawn pending foundation. Several officers were recalled throughout the course of trial in an attempt to establish foundation for the admittance of the gun. The record indicates Officer Paxson saw Officer Brian Schmitz bring the gun into the Law Enforcement Center at Beloit after the search of appellant's car in Osborne. Paxson put the gun in his evidence locker which was locked by a padlock to which he had the only key. The gun was taken out of the locker on May 2, 1980, when it was taken to the KBI laboratory in Great Bend for fingerprint examination. The gun was in Paxson's sole possession the entire time he drove to Great Bend. He signed the gun over to the lab technician and stayed at the lab for one and one-half to two hours while the gun was being examined. No identifiable fingerprints were found on the gun. Paxson received the gun from the KBI technician, received a receipt for the gun from the KBI evidence secretary, and returned to Beloit with it. When he returned to Beloit he gave the gun to Chief Daugherty and the Chief put it in his evidence locker where it remained until trial. The gun was admitted during the second recall testimony of Chief Daugherty.

Appellant contends the chain of events was broken at the KBI

laboratory when the gun was placed in the evidence locker at the KBI because Officer Paxson did not know who had keys to the locker and the weapon's serial numbers were not listed on the evidence receipt.

The chain of custody is complete in this case. In addition, Officer Paxson positively identified the gun at trial, as did Chief Daugherty. The admissibility of physical evidence is within the sound discretion of the trial court. *State v. Nicholson*, 225 Kan. at 419-20. That discretion was not abused.

The judgment of the trial court is affirmed on the convictions of aggravated robbery, felony theft and unlawful possession of a firearm. The judgment of the trial court is reversed as to the conviction of aggravated assault.