No. 76,790

CITY OF DODGE CITY, *Appellant*, v. NORMAN NORTON, *Appellee.*

(936 P.2d 1356)

Opinion filed April 18, 1997.

*Terry J. Malone*, city attorney, argued the cause and was on the brief for appellant.

*Leslie Phelps Hess*, of Patton, Kerbs & Hess, of Dodge City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by:

SIX, J.: Plaintiff City of Dodge City (City) appeals the district court's dismissal of the complaint charging defendant Norman

Norton with driving under the influence of alcohol (DUI), in violation of K.S.A. 1994 Supp. 8-1567, for lack of probable cause to arrest. Our jurisdiction is under K.S.A. 22-3602(b)(1) (appeal by the prosecution as a matter of right from an order dismissing a complaint).

The issue is whether there was sufficient evidence to establish probable cause to arrest Norton for DUI. Was the dismissal of the complaint error? We hold that it was.

Norton appealed his municipal court conviction and sentence. After the appeal, the city prosecutor filed a notice of intent to proffer a certificate of analysis and laboratory report showing the results of a blood alcohol examination of Norton; the blood sample showed blood alcohol of .21 grams per 100 ml. of blood. Norton filed both an objection to the proffer and a motion to dismiss and/or suppress the blood test results, based in part on lack of probable cause for the arrest.

We summarize the testimony at the hearing on the motion to dismiss.

Late on the evening of May 1, 1995, Officer Rose received a radio transmission from another officer (Addison) investigating a complaint concerning someone knocking on a door trying to get somebody up late at night at a trailer park. Rose was alerted to look for an older model General Motors pickup being driven by Norton and to check the driver for intoxication. People at the trailer park who talked to the investigating officer described Norton and the vehicle. They thought Norton was intoxicated. Addison was possibly going to pursue the incident at the trailer park as a disorderly conduct charge. Rose observed a pickup and driver matching the description and began to follow. The street was under construction. There were two lanes of traffic in the south half of the street, one for each direction. Rose observed the pickup miss two construction barrels by inches. A check showed the pickup was registered to Norton. As Rose followed, the pickup veered to the left and went over the center line for a block to a block and a half, then came back into its own lane, missing some construction barrels on the right. The driver was having trouble driving straight in his lane. There were two double yellow street lines through the

construction zone. The pickup slowed down and turned into a vacant lot next to a bar.

Rose was getting ready to stop the pickup when it slowed down at the intersection near the bar, made the turn, and pulled into a driveway. Rose pulled up behind it. Rose met the driver, asked his name, and told Norton that he had been following because another officer had reported that Norton had possibly been drinking, and Rose needed to check him out for that. Rose was 3 or 4 feet from Norton and could not smell any odor of alcohol. There was a slight breeze, and it was misty. Rose asked Norton for his I.D. Norton identified himself and told Rose that he had been trying to find a friend at the trailer park. When the friend did not come to the door, Norton left. Norton told Rose that he then decided to "come back to the bar for a couple more drinks." Based on Norton's statement, Rose thought Norton had had a couple of drinks before. Also, Norton's eyes were "a little bit pink around the edges or blood shot." Rose pointed out that Norton was driving all over the road, had missed construction barrels by inches, and had been driving on the other side of the yellow lines for a block and a half. Norton's facial reaction registered surprise.

Rose asked Norton if he would mind doing a few sobriety tests. Norton cooperated. Rose and Norton went to a flat, level area between the vehicles. Rose asked Norton if he had any trouble with his legs, feet, or hips and Norton said that he had had both legs operated on a few times in the past. Norton was asked to do the heel-to-toe test. He was wearing western style boots with low, flat heels. Rose asked Norton to take five or six steps, turn, and come back. Rose demonstrated for Norton. Norton was using his arms a little bit for balance. He did the five steps. He was missing his heel and toe, but was not doing "too bad," except for the turn. He was slightly off balance on the turn and missed three touches on the way back. At that point, Rose believed that Norton was intoxicated and "under a condition not to be driving." Norton did not do the required heel-to-toe touches. Rose did not know to what extent Norton's surgery had created problems in the test. When Norton was having trouble walking after the sobriety test was completed, Rose decided to move closer. As Rose walked up to Norton

to tell him that he was under the influence and would be arrested and given the breath test, Rose got close enough to smell a faint to moderate, but noticeable, odor of alcohol on Norton's breath. The alcoholic odor further solidified Rose's assessment of Norton's condition, and it played into Rose's decision to make the arrest. Norton was arrested and told he would be given a breath test. He was handcuffed and taken to the hospital. Rose did not give Norton a ticket for driving left of center or disorderly conduct, but told him that he would have to contact Officer Addison in the morning.

Norton testified that the construction barrels took up 2 feet of the right edge of the new concrete, and there was no way to drive in that lane and not go left of center, without going close to the barrels. According to Norton, there was little traffic, and he was taking it easy, driving a little bit further away from the barrels, a little further to the left than he normally drives. Norton did not remember seeing the two yellow lines in the center of the road that evening. Instead, he contended, the tape was wadded up over onto the south side of the road. The vacant lot where Norton took the sobriety test was muddy, and he was wearing regular cowboy boots, not low-heeled boots. Norton told Rose that his knees had been operated on several times and he was not very steady on them. His legs were crooked, so he had trouble walking any straight line. He was waiting to have his knees replaced. Norton has had six major and four minor surgeries on his right knee and two minor surgeries on his left knee. Norton also testified that the pickup he was driving belonged to his brother and was not registered in Norton's name. Norton denied telling Rose that he was coming back to the bar or that he had been there earlier. Norton admitted having four or five beers that evening at the V.F.W.

## The District Court Decision

In granting the motion to dismiss for lack of probable cause, the judge said:

"[I]t's clear to me that there was a reasonable suspicion to stop the defendant. There was a radio transmission indicating that there had been some problems from another officer. Officer Rose was on watch for the defendant. When Officer

Rose began to follow him, he saw the defendant almost hit some barrels, as reported."

The judge found no problem with the stop. However, he did not find probable cause to make the arrest because the surgeries Norton told Rose about could cause walking problems, and the only sobriety test administered was the walking type of test.

Based on the physical condition of Norton's knees, the judge did not believe the field sobriety test used by Rose was valid. The judge concluded that "the only evidence that the officer had at the time he made the arrest was the observation of the defendant's driving, where he went left of center in a construction area where there was nobody coming, but his testimony was that he was doing so because of the barrels that were to his immediate right."

## DISCUSSION

In a DUI case, the answer to the probable cause to arrest question will depend on the officer's factual basis for concluding that the defendant was intoxicated at the time of arrest. Thus, an appellate court's review of the trial court's determination of whether an officer had probable cause to make a warrantless arrest in a DUI case is a mixed question of law and fact. See *State v. Hopper*, 260 Kan. 66, 68-69, 917 P.2d 872 (1996).

The district court made a finding that probable cause to arrest was lacking. This amounts to a negative finding.

"When the findings are negative, however, there must be proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice, since the negative finding signifies the failure of the party upon whom the burden of proof was cast to sustain it." *Lostutter v. Estate of Larkin*, 235 Kan. 154, Syl. ¶ 1, 679 P.2d 181 (1984).

In *State v. Clark*, 218 Kan. 726, 731, 544 P.2d 1372, *cert. denied* 426 U.S. 939 (1976), we said:

" 'Probable cause . . . refers to that quantum of evidence which would lead a prudent man to believe that an offense has been committed. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove guilt is more probable than not. It is only necessary the evidence lead the officer to believe that

guilt is more than a possibility, and it is well-established that the belief may be predicated in part upon hearsay information.' [Citations omitted.]"

### Probable Cause for Warrantless Arrest

K.S.A. 22-2401 sets forth the statutory requirements for making a warrantless arrest. Because Norton was charged with a first DUI offense, a class B misdemeanor, K.S.A. 22-2401(c)(2)(A) or (B) are applicable. Evidence of the crime (Norton's blood alcohol level) would be irretrievably lost unless Norton was immediately arrested and tested. If Norton were allowed to continue driving in his condition, he may have caused serious injury to himself or others. K.S.A. 22-2401(d) is also applicable, in that the officer observed Norton's driving before the arrest. See *State v. Press*, 9 Kan. App. 2d 589, 592, 685 P.2d 887, *rev. denied* 236 Kan. 877 (1984) (applying those provisions of K.S.A. 22-2401 to a DUI warrantless arrest).

Although *Clark* concerned application of K.S.A. 22-2401(c)(1) to a warrantless arrest for rape, this court's discussion of probable cause in that case is useful. See 218 Kan. at 731-32.

Probable cause to make a warrantless arrest under K.S.A. 22-2401 requires something more than a reasonable suspicion sufficient to justify a traffic stop under K.S.A. 22-2402. We discussed the distinction between probable cause to arrest and reasonable suspicion to stop in *State v. Field*, 252 Kan. 657, 659-60, 847 P.2d 1280 (1993). See *City of Dodge City v. Hadley*, 262 Kan. 234, 936 P.2d 1347 (1997).

*State v. Larson*, 12 Kan. App. 2d 198, 737 P.2d 880 (1987), considered a defendant's argument that the results of a field sobriety test should be disregarded because of his physical impairment. Larson was stopped for going 72 mph on the interstate near Topeka. In talking to Larson, the officer noticed that his speech was slurred and he was slow in locating his driver's license. The officer asked Larson to perform several field sobriety tests. There was a strong odor of alcoholic beverage on Larson's breath. Larson was arrested for DUI. Larson testified that he told the officer at the time of the field sobriety tests he had a defect in his left eye and that he would not do well on any coordination or depth per-

ception test and would prefer another field sobriety test. In affirming Larson's DUI conviction, the Court of Appeals stated: "[D]rivers who fail field sobriety tests due to impairments other than drunkenness will be protected by the results of the blood or breath testing performed following arrest." 12 Kan. App. 2d at 204. The Court of Appeals' reasoning applies here.

The better practice would have been for Rose to have required more than one field sobriety test. However, Rose believed Norton was intoxicated after administering the heel-to-toe test. That belief was further solidified when Rose got close enough to smell Norton's breath. Norton was getting out of his pickup to go into the bar when Rose encountered him. Rose could not independently verify the accuracy of what Norton told him about the condition of his knees or determine how that condition might have affected Norton's field sobriety test performance.

Norton argues that Rose did not smell alcohol until he had placed Norton under arrest. Rose's testimony showed that he smelled alcohol on Norton's breath when he approached Norton to place him under arrest after Norton performed the heel-to-toe test. Even if Rose had already decided that Norton was intoxicated before he smelled alcohol on Norton's breath, if his smelling of the alcohol occurred before the instant of arrest, it should be considered as part of the basis for the probable cause determination.

At the time of the arrest, Rose had the following undisputed information: (1) Norton had created a disturbance at a trailer park and was intoxicated and driving a pickup; (2) Norton's pickup narrowly missed construction barrels and weaved in his own lane; (3) Norton parked next to a bar, got out of his pickup, and told Rose he had been at the trailer park to arouse a friend and was going into the bar for a few drinks; (4) Norton's eyes were pink or bloodshot; (5) Norton told Rose he had problems with his legs and failed the heel-to-toe test; and (6) Rose smelled alcohol on Norton's breath as he approached him to place him under arrest. This information is sufficient to establish probable cause to arrest.

We sustain the City's appeal and remand the case for further proceedings.