No. 56,744

STATE OF KANSAS, *Appellee*, v. MICHAEL DOUGLAS PETERSON, *Appellant*.

(696 P.2d 387)

Opinion filed March 2, 1985.

*Joseph L. Dioszeghy*, of Overland Park, argued the cause and was on the brief for appellant.

*Susan Kulp Stolle*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Dennis W. Moore*, district attorney, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Michael Douglas Peterson was convicted by a jury of felony murder in violation of K.S.A. 21-3401, and aggravated robbery in violation of K.S.A. 21-3427. He appeals.

At approximately 12:30 p.m. on July 14, 1983, the body of Mae Adele Hilleary was found in a Christian Science Reading Room located in Merriam, Johnson County, Kansas. Mrs. Hilleary's body was discovered by a friend and fellow church member who had gone to the reading room sometime during the noon hour on July 14, 1983. Police were summoned.

Attempts by a rescue worker to revive Mrs. Hilleary proved to be unsuccessful. Dr. James G. Bridgens, a pathologist, concluded that the victim had died between 11:00 a.m. and 11:30

a.m. of a single small caliber gunshot wound to the back of the head.

Mrs. Hilleary had been filling in as a substitute librarian on the day of her death. Although no money was discovered missing from the sales area of the reading room itself, the perpetrator had apparently taken money and credit cards from the victim's purse.

In addition, the victim's undergarments had also apparently been taken by the killer, although there was no evidence of sexual abuse.

The Metropolitan Major Case Squad, consisting of police officers from surrounding jurisdictions, joined in the investigation. The day following the murder, the Metro Squad interviewed David Messmer, who had been in close proximity to the Christian Science Reading Room at about the time the murder was committed. As he was about to enter his automobile parked in front of the building next to the reading room, Messmer observed a light blue car, which he later identified as a Pontiac Sunbird, driven by a young man of 25 to 35 years of age come speeding out of the alley away from the building, hit a dip as it entered the roadway, apparently scraping the undercarriage, and depart at a high rate of speed.

That same night, July 15, 1983, Metro officers were summoned to a halfway house where a resident of the house, John Woolsey, related that the afternoon of the murder he had been walking to the halfway house with a friend when he observed four or five credit cards. He picked one of the cards up and then discarded it without thinking anymore about it until reading about the homicide the next day in the newspaper. He recognized the name of the victim as being the same as the name on the credit card he had picked up. He then returned to the lot and picked up the card which he turned over to the police. Later, a search of the lot by the police led to the discovery of various credit cards bearing the name of the victim.

On July 16, 1983, Metro Squad officers were contacted by Elaine Dalton, a detective with the Kansas City, Missouri Police Department, who was not involved in the investigation, but who had information she wanted to pass along to the Metro Squad. Dalton related that a Randy Smith had called her and told her that Michael Peterson should be checked out because he was capable of something like this. Smith told Dalton that Peterson lived with a Michael Taraboulos and that Peterson had access to

Taraboulos' car, a late model blue Oldsmobile. Dalton also told Metro Squad officers that several weeks earlier Peterson had gone into the Christian Science Reading Room in Kansas City, Missouri where her mother, Mrs. Lloree Jones, was working. Peterson had tried to borrow money from her. When Mrs. Jones refused to give Peterson money, he got angry and said "How would you like for me to just slap the hell out of you? I wish you were dead."

Metro Squad officers then interviewed Randy Smith, the head librarian at the Kansas City, Missouri, Christian Science Reading Room. Smith related that he met Peterson when Peterson came into the reading room asking for money, that he found employment for Peterson, and on occasion employed Peterson at the church. Smith further stated that Peterson often took and used Smith's credit cards and other property without permission. He and Peterson, who was a moody person, had had some violent confrontations in the past over trivial matters. On other occasions, Peterson had tried to "con" money at other Christian Science Reading Rooms. Smith also stated that Peterson had become angry at an employee of the reading room, Mrs. Jones, when she refused to loan him money in the past, and had not shown up for work at the church on the day of the murder.

Other officers of the Metro Squad summoned Mike Taraboulos to the Merriam, Kansas, Police Department to search his automobile and to interview him. Taraboulos said that Peterson had been living with him for approximately one week and had access to his gray with dark blue accents 1979 Oldsmobile Cutlass. Peterson had taken Taraboulos to work the morning of July 14, and had picked him up sometime between 5:30 and 6:00 p.m. During the previous week, Peterson had mentioned buying a gun for his own protection. Peterson had purchased Taraboulos' breakfast the day following the murder with "extra" money.

Taraboulos agreed to allow officers to search his car and apartment. About 7:15 p.m. that same evening, police searched the car at the Merriam Police Department headquarters. Nothing was found inside the car, but recent scratches and concrete dust were found on the front, underneath side of the car.

Upon entering Taraboulos' apartment to conduct the search, police officers ascertained that Peterson was present. He was

placed in custody and put into handcuffs at 8:00 p.m. Officers then searched the apartment and discovered a map torn from a telephone book on which was marked the location of Christian Science churches in Kansas and one Christian Science Reading Room in Missouri. Also seized was the clothing Taraboulos had described Peterson as wearing the day of the murder.

Peterson was then transported to the Kansas City, Missouri, Police Station and advised of his *Miranda* rights. Following Peterson's acknowledgement and waiver of his right to remain silent and his right to an attorney, he was interviewed by Detective Orr and Trooper Kreamer. He initially denied any knowledge of the murder of Mrs. Hilleary, but after further questioning, Peterson admitted he had killed Mrs. Hilleary and described the murder.

Following the initial oral confession, other officers again advised Peterson of his rights, obtained a written waiver, and videotaped a second confession. This interview concluded in the early hours of July 17, 1983. At 11:30 a.m. July 17, while still in custody at the Kansas City, Missouri, Police Department, Peterson was interviewed by Detective Burke of the Lenexa, Kansas, Police Department. Detective Burke again advised Peterson of his rights and received a waiver of rights from him. Peterson told the detectives where he had thrown the gun and the victim's undergarments, and generally described how the killing had occurred.

On July 18, 1983, Peterson, while enroute to the Johnson County Jail in Olathe, Kansas, was again advised of his rights which he again verbally waived. Peterson then directed officers to the areas where he claimed to have thrown the gun out of his car after the shooting.

During the booking procedure at the Johnson County Jail, Peterson was overheard to say that he had done it, but that he could not be found guilty because everything had been arranged.

Members of the Metro Squad searched for the victim's undergarments and the murder weapon, but none were found. Officers then interviewed Peterson at approximately 8:00 p.m. on July 18, 1983, to attempt to get him to tell them the location of the gun. During the interview, which was tape recorded, Peterson recanted all of his prior confessions and absolutely denied his guilt.

On that same day, July 18, 1983, Messmer, the witness who had seen the automobile speeding away from the scene of the homicide, was taken by the police to the storage lot where Taraboulos' automobile was being held. Messmer could not positively identify the automobile as the one he had observed leaving the scene.

Following the denial of defendant's pretrial motions to suppress his previous confessions, defendant was initially brought to trial on December 5, 1983. The first trial resulted in a hung jury. Defendant was retried and ultimately found guilty of all charges on January 23, 1984. On March 16, 1984, he was sentenced to a term of life imprisonment on the felony murder conviction and to a consecutive term of fifteen to twenty years on the aggravated robbery charge.

Peterson argues on appeal that the trial court erred in not granting the motion to suppress his confession. Peterson contends that the police did not have sufficient and probable cause to arrest him, and, they, therefore, committed an illegal arrest. He argues that because his arrest was illegal, any evidence obtained in connection with the arrest, including the confessions, was tainted and could not be used against him. The State claims there was sufficient probable cause for the arrest, and, therefore, the confessions were not tainted.

In *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed. 2d 441, 83 S.Ct. 407 (1963), the United States Supreme Court held that verbal evidence which derives from an unlawful arrest may not be used against a defendant unless the connection between the arrest and the statement has become so attenuated as to dissipate the taint. In *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed. 2d 416, 95 S.Ct. 2254 (1975), the United States Supreme Court held that *Miranda* warnings by themselves were not sufficient to dissipate the taint of an unconstitutional arrest.

We considered the admissibility of a statement following an illegal arrest in *State v. Johnson*, 222 Kan. 465, 565 P.2d 993 (1977). An illegal arrest per se does not require the suppression of all subsequent statements made by the accused. Unless facts of the case establish that an unlawful arrest or detention in and of itself constituted duress which would render a statement by the accused involuntary, the same rule as to admissibility of a statement is applicable as if an arrest and detention were lawful.

Under Kansas law, the constitutional validity of a warrantless arrest depends upon whether the arresting officer had probable cause to believe that the person arrested had committed a felony. Under K.S.A. 22-2401(c)(1), probable cause refers to that quantum of evidence which would lead a prudent man to believe that an offense has been committed. The evidence giving rise to probable cause need not be sufficient to prove guilt beyond a reasonable doubt, nor need it be sufficient to prove guilt is more probable than not. *State v. Clark*, 218 Kan. 726, 544 P.2d 1372, *cert. denied* 426 U.S. 939 (1976).

Peterson was initially arrested in the State of Missouri by Missouri officers accompanied by Kansas officers. In the absence of an applicable federal statute, the law of the state where an arrest without a warrant takes place determines its validity. *United States v. Di Re*, 332 U.S. 581, 92 L.Ed. 210, 68 S.Ct. 222 (1948). Missouri Revised Statutes § 544.216 provides that law enforcement officers may arrest on view, and without a warrant, any person the officer sees violating or who the officer has reasonable grounds to believe has violated any laws of that state, including a misdemeanor, or has violated any ordinance over which the officer has jurisdiction. In *State v. Abbott*, 571 S.W. 2d 809 (Mo. App. 1978),.that court determined that in every case in which the existence of probable cause is an issue, the court must exercise a subjective judgment; that in the final analysis the determination of probable cause depends on the particular facts and circumstances of the individual case.

Probable cause to arrest without a warrant simply means a knowledge of facts and circumstances sufficient for a prudent person to believe a suspect is committing or has committed an offense. Its existence must be determined by practical considerations of everyday life on which a reasonable person acts and not on the hindsight of legal technicians.

It is well established that where a law enforcement officer arrests with a warrant the collective information of the police officers and law enforcement officers involved in obtaining the warrant forms the basis for the probable cause for the arrest with the warrant, even though that information is not within the knowledge of the arresting officer. In addition, an officer without a warrant, who has sufficient personal knowledge or collective information from other law enforcement officers to form the basis

for probable cause, can request a second officer who has come in contact with the suspect to arrest the suspect under proper circumstances.

The knowledge of the arresting officer is relevant only where an arrest is predicated on that officer's personal observations and information concerning the criminal act. The correct test is whether a warrant if sought could have been obtained by the arresting officer. In a cooperative investigation by many law enforcement officers, the knowledge of one officer is the knowledge of all in determining probable cause for an arrest, provided there has been communication between the individual officers.

The question here is whether sufficient information had been communicated to Detective Orr and Trooper Kreamer for those officers to determine there was probable cause to arrest Peterson. Detective Orr and Trooper Kreamer had knowledge of all the information gathered by the various law enforcement officers except the information concerning Taraboulos' car, which Peterson had been driving on the day of the murder. Merriam police officers examined the car and found recent scratches and concrete dust on the front and underneath side of the car while officers were searching Taraboulos' apartment.

Under the facts and circumstances of this case the arresting officers had sufficient information to form a basis for probable cause to arrest the defendant without a warrant. The statements given by the defendant were derived from a lawful arrest in Missouri and those statements could be used against the defendant at his trial in Kansas.

During the second trial Officer Elaine Dalton testified that her mother told her Michael Peterson came into the Christian Science Reading Room in Kansas City, Missouri, where she was working, and demanded money. This incident had occurred several weeks before the murder of Mrs. Hilleary. Mrs. Jones had related it to her daughter the day the incident occurred or possibly the next day. Mrs. Jones had died in September prior to the trial. The trial court allowed the testimony over the objections of the defendant. The defendant claimed: (1) that the evidence fell within the prohibition of K.S.A. 60-455; (2) that the prejudicial effect of the evidence far outweighed the probative value; and (3) that the testimony was inadmissible hearsay.

Was the incident which occurred between Mrs. Jones and

Peterson admissible as an exception to the prohibition of K.S.A. 60-455? Subject to certain exceptions, 60-455 prohibits introduction into evidence the fact that a person has committed a crime or a civil wrong on a specific occasion to prove that person's disposition to commit a crime or civil wrong as a basis for the inference that the individual committed the crime or civil wrong for which he is now being tried. Evidence of a prior crime or civil wrong is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Unless the evidence is relevant to an issue other than disposition to commit crimes or torts, it is inadmissible.

Evidence of a prior crime or civil wrong is excluded because of its prejudicial effect to the defendant. At least three types of prejudice arise from the admission of other crimes or civil wrongs as evidence. First, a jury might well exaggerate the value of the other crime or civil wrong as evidence inferring that, because a defendant has committed a similar crime or civil wrong before, it can be concluded that he committed this one. Second, the jury might conclude that the defendant deserves punishment because he has been a wrongdoer in the past even where the moving party has failed to establish by the proper burden of proof that the defendant has committed the act for which he is now being tried. Third, the jury might conclude that, because of the defendant's past acts, the evidence on his behalf should not be believed. For an in-depth discussion of the general principles of law followed in applying K.S.A. 60-455, see *State v. Bly*, 215 Kan. 168, 523 P.2d 397 (1974).

In order for the evidence of what occurred between Mrs. Jones and Peterson to be admissible as an exception to the prohibition of 60-455, it must be evidence of a prior crime or civil wrong occurring on a specific occasion. We do not believe that Peterson's encounter with Mrs. Jones was a crime or civil wrong. Therefore, the evidence of that encounter could not be admitted as an exception to the prohibition of 60-455. We do believe that the evidence of the encounter has a direct bearing on the offense for which Peterson was charged. It was one of the acts and circumstances which was an incident to the litigated act and which was illustrative of the act, and, therefore, a part of the "res gestae."

Prior to the adoption of the Code of Civil Procedure, Kansas courts spoke of "res gestae" as one of the exceptions to the prohibition against the introduction of hearsay into evidence. The res gestae exception to the admissibility of hearsay dealt with declarations made before, during or after the happening of the principal occurrence. These declarations were admissible as part of the res gestae where the declarations were so closely connected with the principal occurrence as to form in reality a part of the occurrence. The adoption of 60-460(d) replaced the res gestae exception with the contemporaneous statement exception to the hearsay rule.

Res gestae is a broader concept than an exception to the hearsay rule. It actually deals with admissibility of evidence of acts or declarations before, during or after happenings of the principal event. Those acts done or declarations made before, during or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence. *State v. Sherry*, 233 Kan. 920, 667 P.2d 367 (1983). Res gestae includes those circumstances which are automatic and undesigned incidents of the particular litigated act, which may be separated from the act by lapse of time but are illustrative of such act. It is the whole of the transaction under investigation or being litigated and every part of it. Acts done or declarations made before, during or after the principal occurrence may be admissible as part of the res gestae to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake.

We believe the incident that occurred between Mrs. Jones and Peterson formed a part of the res gestae made before the happening of the principal occurrence; that the incident was so closely connected it formed in reality a part of the occurrence and was properly admitted as part of the res gestae.

The Kansas Code of Civil Procedure prohibits the introduction into evidence of a statement which is made other than by the witness testifying at the hearing which is offered to prove the truth of the matter stated. Thirty exceptions to the prohibition against the admission of hearsay evidence are set out in K.S.A. 60-460.

Hearsay evidence derives its value, not only from the witness

testifying upon the stand, but more importantly from the veracity and the competency of some other person. Since the declarant is not present and available for cross-examination, both the court and jury are without opportunity to test the credibility of the hearsay statements by having the person who spoke the words before them. One of the reasons for the exclusion of hearsay statements is that the person who made such statement has not been placed under oath and the declarant is not responsible for the crime of perjury for making a willful, false statement. Exceptions to the hearsay rule were created in the interest of justice. These exceptions are allowed because of the circumstantial guarantee of the trustworthiness of the evidence offered. The circumstantial guarantee is a substitute for the oath of the declarant and his cross-examination by the party against whom the hearsay is admitted.

K.S.A. 60-460(d) allows the introduction into evidence of a statement that was made (1) while the declarant was perceiving the event or condition which the statement narrates, decribes, or explains, (2) while the declarant was under the stress of a nervous excitement caused by such perception, or (3) if the declarant is unavailable as a witness, those statements made by the declarant at the time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or distort.

In *State v. Berry*, 223 Kan. 566, 575 P.2d 543 (1978), this court allowed the admission of a statement made by a victim to police officers eight days following the shooting. At the time of trial, the declarant had died. This court determined that the victim's recollection of the events were clear, that the statement had been made in good faith prior to the commencement of the action, and that the statement was made with no incentive to falsify or distort. The requirements of the statute were fulfilled and the trial court's admission of the statement into evidence was proper.

This exception to the hearsay rule was recently considered in *State v. White*, 234 Kan. 340, 673 P.2d 1106 (1983). In *White*, the defendant was convicted of the offense of aggravated robbery. Officers received information that a small boy had been left unattended in a black and gold Cadillac. Upon their arrival at the scene, police officers found Joseph Jackson and his one-year-old

brother in the Cadillac. Joseph told officers that a man named Wallace had brought them there and had left in another car driven by his father, Howard White. The children were taken to police headquarters.

Thinking that the Cadillac might be a possible getaway car, the police staked out the area. Shortly thereafter, a black man ran to the car and got in it. Police officers, while following the car, received word of a holdup at a nearby bank by two black males driving a Buick. Officers had spotted a Buick matching the description of the suspects' car a short distance from where the Cadillac had been parked. Officers later arrested White.

At the time of the trial, Joseph Jackson could not be located. The statements made to the officers explaining why he and his younger brother were alone in the car and where the driver had gone were admitted into evidence. Jackson's statement was made shortly after he and his brother had been left alone in the car. It was doubtful that a six-year-old would make a statement except in good faith and there was no reason or incentive to falsify or distort the statement. The statements were made prior to the commencement of a criminal prosecution and were admissible under the exceptions to the hearsay rule.

In this case, there is no question that Mrs. Jones was unavailable as a witness since she had died prior to trial; nor that Mrs. Jones' statement to her daughter was one describing or narrating an event. The matter described by Mrs. Jones had been recently perceived by her and the statement was made on the same day or the following day while her memory was fresh. Under the circumstances, the statement was made in good faith, before there was an action pending. There was no incentive for Mrs. Jones to falsify or distort her statement. Any possible motive for Mrs. Jones to falsify the statement was absent.

Defendant argues that the trial court never made findings required by K.S.A. 60-460 for the admission of a hearsay statement. We disagree. During a hearing outside the presence of the jury, the court stated:

"This court is not going to spend a great deal of time on the subject matter of hearsay. The court has heard Mrs. Dalton's testimony and the testimony relates to conversations she had with her mother, now deceased. The conversation was given at a time when there could have been no motivation as to the innocence or guilt of the defendant Peterson. It cannot be described as a dying declaration, but

the court is satisfied that the hearsay aspect of the conversation is not such that it should be ruled inadmissible."

The trial court correctly determined that the statement of Mrs. Jones had satisified the foundation requirements for admissibility into the evidence.

Defendant finally complains that the trial judge failed to give an instruction limiting the purpose for which Mrs. Jones' and Peterson's encounter was to be considered. If admitted as an exception to 60-455 it was error not to give a limiting instruction.

In every case where evidence of other crimes or civil wrongs is admitted pursuant to 60-455, the trial court should give an instruction limiting the purpose for which evidence of a similar offense or civil wrong is to be considered. *State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397 (1974). Where evidence has a direct bearing on or a relation to the commission of the offense itself, forming a part of the res gestae, such evidence is admissible without a limiting instruction. Under the facts of this case, the trial court was not required to give a limiting instruction because that evidence formed a part of the res gestae.

Affirmed.

HOLMES, J., concurring in the result.