No. 64,772

STATE OF KANSAS, *Appellee,* v. M. C. MAYBERRY, *Appellant.*

(807 P.2d 86)

Opinion filed March 1, 1991.

*Charles D. Dedmon,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Timothy J. Chambers,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: M. C. Mayberry directly appeals his jury convictions of first-degree murder, K.S.A. 21-3401, and aggravated burglary, K.S.A. 21-3716. Mayberry was sentenced pursuant to the habitual criminal act to two consecutive life sentences for the murder conviction and ten to forty years on the aggravated burglary conviction. The sentences run consecutively.

Early in the morning of May 4, 1989, thirteen-year-old Brandi Henks found her slain mother, Dixie Long. Reno County Sheriff's officers and Hutchinson police officers responded to a call for assistance and found the victim lying in her bed, slain by a shotgun blast to her head. Brandi Henks told police officers that, after she had awakened, she found the front door standing open and then found her mother's body. Henks also stated she believed M. C. Mayberry, Long's boyfriend, committed the murder because Long and Mayberry had recently been fighting. A broken window at Long's beauty salon was also reported on the morning of May 4. There were no other signs of entry.

Bloodstain pattern analysis revealed Long was sitting up with a pillow held before her face at the time of death. No murder weapon was ever discovered. Shotgun pellets and wadding, however, were found in the victim's bedroom. Police discovered telephone wires to the residence had been cut and found evidence of forced entry. Bloodstain directional analysis testing showed there was little likelihood the assailant's clothing would be bloodied from back splatter.

Testimony produced at trial revealed that Mayberry had purchased a 12-gauge pump shotgun and ammunition on the afternoon of May 3. Friends of Long testified she had been having "problems" with Mayberry and that she suspected he might be involved with earlier burglaries at her residence. On May 3, Long had lunch with Mayberry. Later, the same afternoon, she arrived at work upset and worried that bruises on her neck would show. Long told others she and Mayberry had had a fight during the lunch hour and that he had hit her.

Long's neighbor stated he saw Mayberry's car parked in front of Long's residence about 4:30 a.m. May 4. A friend of Mayberry testified he saw the defendant driving near Long's residence at 4:00 a.m. on May 4.

A search of Mayberry's bedroom produced a box of shotgun shells with seven shells missing. Shotgun pellets and wadding found at the crime scene were compared with and found to be consistent with shells in the box discovered at Mayberry's residence. A pair of needlenose pliers was found in a toolbox in Mayberry's automobile. Extensive research was conducted on a paint chip found on the pliers. The paint chip consisted of a fine layer of sand and two layers of paint, consistent with the known samples taken from the cut telephone wires.

Mayberry's residence was placed under surveillance early May 4, and at 8:30 a.m. he left the residence. Police officers followed Mayberry several blocks before pulling him over. Mayberry was ordered from the car at gunpoint, patted down, handcuffed, and driven to the police station for questioning.

At 9:30 a.m. the first of four interviews began. Mayberry was informed he was not in custody but was questioned about Long's death. Mayberry denied any problems existed in his relationship with Long. The interviewing officer, Detective Baxter, did not advise Mayberry of his *Miranda* rights until Mayberry provided answers inconsistent with the information possessed by Baxter. Mayberry continued to answer questions but denied striking Long, denied the relationship was breaking up, and denied owning any weapons. During the second interview, Mayberry denied fighting with Long at the May 3 lunch and stated he purchased shotgun shells for his father the previous week, but denied opening the box. During this interview, Mayberry's clothes and samples of his hair and blood were taken for analysis. At the final interview at 4:50 p.m., Mayberry stated he purchased a shotgun the morning of May 3 and gave it to Long over the noon hour. Mayberry was formally arrested at 6:00 p.m.

At trial, Mayberry's sole theory of defense was a denial of any involvement in Long's slaying. On appeal, he asserts the warrantless arrest and the subsequent search of his residence and automobile violated his Fourth, Fifth, and Fourteenth Amendment rights. Mayberry argues the trial court committed reversible

error in denying motions to change venue and to discharge the jury panel and in refusing to dismiss jurors challenged for cause. Mayberry also contends the trial court erroneously allowed evidence of gruesome photographs and hearsay testimony and committed reversible error in refusing to instruct on second-degree murder. Finally, Mayberry asserts abuse of discretion in sentencing.

The first issue we consider is Mayberry's argument that he was arrested without probable cause, thereby violating the Fourth Amendment and tainting all evidence subsequently obtained. Mayberry alleges he was arrested when police officers handcuffed and transported him involuntarily to police headquarters, rather than at 6:00 p.m. when formal arrest occurred.

The Fourth Amendment to the United States Constitution provides that no warrant shall issue, except upon probable cause. Warrantless arrests are constitutionally valid, however, where the arresting officer has probable cause to believe a criminal offense has been committed. *Beck v. Ohio,* 379 U.S. 89, 96, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964); *Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir. 1985); *State v. Peterson,* 236 Kan. 821, 826, 696 P.2d 387 (1985). Probable cause exists when the arresting officer has knowledge of facts and circumstances sufficient for a prudent person to believe the suspect is committing or has committed an offense. *Peterson,* 236 Kan. at 826; *State v. Costello,* 231 Kan. 337, 338, 644 P.2d 447 (1982). Thus, the time of Mayberry's arrest is essential in determining whether the police possessed sufficient information to constitute probable cause.

In *Dunaway v. New York,* 442 U.S. 200, 203, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), a police detective acquired information implicating the petitioner in murder. The information, however, was insufficient to obtain an arrest warrant so the detective ordered the petitioner "picked up" for questioning. The petitioner was taken into custody, driven to police headquarters, and placed in an interrogation room. The petitioner was not told he was under arrest but would have been restrained had he attempted to leave. Subsequent to the administration of *Miranda* warnings, the petitioner made incriminating statements.

The *Dunaway* Court ruled the petitioner was seized when he was involuntarily taken into police custody. The Court found

petitioner's detention was similar to a traditional arrest because he was transported to police headquarters and never was informed he was free to go. Thus, the Court ruled petitioner's incriminating statements, made subsequent to an illegal arrest, were inadmissible evidence. 442 U.S. at 212-13, 216-19.

In the present case, Mayberry was actually seized when the officers ordered him from the automobile at gunpoint, handcuffed him, and transported him to the police station. Mayberry was not informed he was free to go and would have been physically restrained if he had attempted to leave. Mayberry was held in custody for six hours without being told he was under arrest. Under the circumstances, we conclude Mayberry was subjected to a warrantless arrest when he was taken into police custody at 8:30 a.m. on May 4.

Now, let us consider whether the police had sufficient information to constitute probable cause when Mayberry was taken into custody. At the hearing on the motion to suppress, Detective Baxter testified he possessed the following information when he directed Officer Henderson to bring Mayberry in for questioning. Baxter stated he investigated the crime scene beginning at 6:40 a.m. and spoke with other investigating officers. He learned that Mayberry was the victim's boyfriend and lived part-time at Long's residence. Baxter also discovered from Long's friends that she and Mayberry had had a fight the previous day. Finally, Baxter knew Mayberry had been convicted of a prior murder of a girlfriend.

Mayberry contends Baxter's information did not reach the level of probable cause, but merely cast suspicion on him. In addition, Mayberry asserts Officer Henderson did not possess independent knowledge and alleges the communication between Henderson and Baxter was too brief to impute Baxter's knowledge to Henderson.

Detective Baxter advised Henderson that Mayberry was a suspect in Long's murder and directed Henderson to continue surveillance of the residence and to bring Mayberry in for questioning if he attempted to leave. It is well established that an officer without a warrant, who possesses sufficient personal knowledge or collective information from other law enforcement officers to constitute probable cause, can direct a second officer

to arrest the suspect. *State v. Peterson,* 236 Kan. at 826-27. Under the fellow officer rule, probable cause is determined by the collective information of the police involved in the investigation rather than the exclusive knowledge of the particular officer who made the actual arrest. *Karr v. Smith,* 774 F.2d at 1031; *United States v. Ashley,* 569 F.2d 975, 983 (5th Cir.), *cert. denied* 439 U.S. 853 (1978). See *State v. Peterson,* 236 Kan. at 827; *State v. Niblock,* 230 Kan. 156, 161, 631 P.2d 661 (1981). Thus, Detective Baxter's collective information was clearly imputed to Officer Henderson.

Evidence of probable cause need not reach the level to prove guilt beyond a reasonable doubt, but it must constitute more than mere suspicion. See *State v. Boyle,* 207 Kan. 833, 838, 486 P.2d 849 (1971). In determining whether probable cause exists, we consider all the information in the officer's possession, the fair inferences drawn therefrom, and facts that might not be admissible on the issue of guilt. *State v. Strauch,* 239 Kan. 203, 209, 718 P.2d 613 (1986).

In *State v. Strauch,* we found probable cause existed for the defendant's arrest for murder where an assistant district attorney testified that he had leads and information identifying the defendant as the principal suspect, that investigators had a picture of the defendant provided by a witness, and that investigators knew to look for a pickup carrying roofing equipment. We held a prudent person possessing this information and drawing reasonable inferences therefrom could believe the defendant had committed murder. 239 Kan. at 209.

In *State v. Costello,* 231 Kan. 337, we found probable cause existed for the defendant's arrest where a detective viewed the bloody murder scene, had information that the defendant had been at the victim's house the night before and had acted strangely, and found the defendant possessing a knife and blood-splattered shoes. 231 Kan. at 339.

In contrast, the United States Supreme Court determined probable cause was lacking for petitioner's arrest in *Taylor v. Alabama,* 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664 (1982), where the petitioner was arrested without warrant solely on the tip of an informant that petitioner was involved in a robbery. The petitioner was arrested and taken in for questioning. The Court

found the arrest was made in the hope of eliciting further information, thereby constituting an illegal arrest. 457 U.S. at 689, 691.

In the present case, Detective Baxter investigated the crime scene and knew Mayberry was the victim's boyfriend and had lived with her part-time. Detective Baxter also knew Long and Mayberry had had a fight the day before the murder, knew that Mayberry previously had been convicted of murder of a girlfriend, and had heard Brandi Henks accuse Mayberry of the killing. Given the above information and the reasonable inferences drawn therefrom, we conclude a reasonably prudent person would believe there was probable cause Mayberry committed the murder.

Next, Mayberry alleges the search warrants issued for his residence and automobile were issued without probable cause and without particularity and were not relied upon in good faith by the police. More specifically, Mayberry contends the affidavit in support of the search warrants was insufficient to establish probable cause that Mayberry committed the crime.

Before a search warrant may issue, there must be a finding of probable cause by a neutral and detached magistrate. The search warrant affidavit must set forth sufficient factual information to enable the magistrate to make an independent evaluation that probable cause exists. Mere conclusions and affirmations of belief are not sufficient. *State v. Dunn,* 233 Kan. 411, 414, 662 P.2d 1286 (1983); *State v. Marks,* 231 Kan. 645, 647, 647 P.2d 1292 (1982).

Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. It does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt. *State v. Abu-Isba,* 235 Kan. 851, 853-54, 685 P.2d 856 (1984). See *State v. Dunn,* 233 Kan. at 414-15; *State v. Lamb,* 209 Kan. 453, 467, 497 P.2d 275 (1972), *rev'd in part on other grounds* 225 Kan. 38, 587 P.2d 861 (1978). Probable cause has been described as " '[b]its and pieces of information . . . fitted together until a picture is formed which leads a reasonably prudent person to believe a crime has been . . . committed and that evidence of the crime may be found on a particular person or in a place or means of conveyance.' " *State v. Marks,* 231

Kan. 645, 647, 647 P.2d 1292 (1982) (quoting *State v. Morgan,* 222 Kan. 149, 151, 563 P.2d 1056 [1977]). See *State v. Williams,* 229 Kan. 290, 291, 623 P.2d 1334, *reh. denied* 229 Kan. 646, 630 P.2d 694 (1981).

The affidavit in the present case supplies information that the victim was found in her bedroom murdered by a shotgun blast. The affiant logically concluded the assailant's body or clothing might also be bloodied. The affidavit also supplies information that Mayberry had lived with the victim in the past, but had recently been ordered to move. Additionally, the affidavit states Mayberry and Long had been involved in a physical altercation the day preceding the murder. Finally, the affidavit informs of cut telephone wires outside the victim's home and suggests that the assailant may have broken into Long's beauty salon to obtain a key to the residence.

The circumstantial evidence provided more than mere suspicion of Mayberry's guilt. Personal observation of the crime scene logically led to the conclusion that the suspect's clothing would be bloodied. Information that Mayberry had recently fought with the victim and struck her pointed the finger of suspicion toward Mayberry. The break-in at Long's business, along with information that a key to her residence was kept there, raised an inference the assailant had knowledge of the whereabouts of the key. The cumulative circumstantial evidence, therefore, was sufficient for the finding of probable cause. Thus, the box of shotgun shells discovered in Mayberry's bedroom and the needlenose pliers found in a toolbox in his automobile were admissible evidence in his trial.

Mayberry next contends the trial court erroneously denied motions to change venue. He argues it was impossible to obtain an impartial jury and fair trial due to substantial media coverage of the crime, which included numerous references to defendant's prior murder conviction and mentioned a wrongful death suit commenced by the victim's daughter against defendant. He also alleges that the trial court's suppression of evidence concerning the prior murder conviction establishes that such evidence was prejudicial to his substantial rights. In addition, Mayberry asserts the trial court's denial of expenses for a survey of community attitudes violated his due process rights.

The determination to change venue lies within the trial court's discretion and will not be disturbed upon appeal absent a showing of prejudice to the substantial rights of the defendant. The burden is on the defendant to show community prejudice to such a degree that it is impossible to obtain an impartial jury, and the showing must be more than mere speculation. *State v. Goss,* 245 Kan. 189, 194, 777 P.2d 781 (1989); *State v. Dunn,* 243 Kan. 414, 424, 758 P.2d 718 (1988).

Extensive pretrial publicity has never been sufficient to establish prejudice per se. *State v. Dunn,* 243 Kan. at 424; *State v. Hunter,* 241 Kan. 629, 635, 740 P.2d 559 (1987). To determine whether a defendant's right to a fair trial is jeopardized, we examine the jury selection process; the degree of pretrial publicity; the length of time which elapsed from dissemination of the publicity until the time of trial; the familiarity with the publicity complained of and its effect on prospective and actual jurors; the challenges exercised by the defendant in selection of the jury; and the severity of the offense charged. *State v. Ruebke,* 240 Kan. 493, 499-500, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

In the case at hand, jury selection took two and one-half days. Sixteen of the potential jurors were excused for cause. On the remaining venire 41 jurors possessed some knowledge of the crime through the media and 13 had knowledge of Mayberry's prior conviction. Mayberry challenged all potential jurors for cause who knew about the prior conviction; however, only one was excused. Nine of the actual jurors possessed information from the media, two knew of Mayberry's prior conviction, and one possessed no media information. One of the alternate jurors had obtained media information and the other alternate knew of the prior conviction. During voir dire, the trial judge carefully questioned individual prospective jurors who had heard or read information about the crime. All of the actual jurors with knowledge of the prior conviction asserted that such information would not prevent them from being fair and impartial jurors.

Under these circumstances, we find Mayberry failed to show prejudice in the prospective jurors. Numerous veniremen were excused for cause and those who remained as jurors assured the trial court that outside information would not affect their ability

to serve as jurors. The trial court did not abuse its discretion in denying Mayberry's motions for a change of venue.

The authorization of funds for expert services necessary for an adequate defense in a criminal defendant's case lies within the sound discretion of the trial court. K.S.A. 22-4508. We will not disturb the trial court's ruling unless the defendant shows prejudice to his or her substantial rights resulting from abuse in the exercise of the court's discretion. *State v. Owens*, 248 Kan. 273, 807 P.2d 101 (1991). *State v. Dunn*, 243 Kan. 414, 418, 758 P.2d 718 (1988). The trial court determined Mayberry failed to establish prejudice and thereby denied recovery of survey expenses. We find the trial court did not err in denying the expenses.

For his next issue, Mayberry argues the trial court erred in denying his motions to discharge the jury panel. Mayberry sought a mistrial based upon a potential juror's statement, before the second panel of veniremen, which indicated he knew about Mayberry from his previous conviction.

K.S.A. 22-3423(1)(c) authorizes the trial court to order a mistrial where prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. Declaration of a mistrial is a matter entrusted to the trial court's discretion and that decision will not be disturbed on appeal absent a clear showing of abuse of discretion. *State v. Ruebke*, 240 Kan. at 506; *State v. Rider, Edens & Lemons*, 229 Kan. 394, 407, 625 P.2d 425 (1981).

In *State v. McCorgary*, 224 Kan. 677, 687, 585 P.2d 1024 (1978), a prospective juror expressed a feeling in front of other prospective jurors that she believed the newspaper accounts of the murder were true. The speaker, a cousin of the defendant, was excused and the jurors were admonished to disregard statements by prospective jurors and information they read in newspapers. We found the statements were inadvertent and unintentional and held there was no showing of substantial prejudice to the defendant.

In the present case, the prospective juror who spoke of a prior conviction in front of other prospective jurors was excused for cause. The improper comment was not precipitated by State action, and the prospective juror made no indication of the crime

upon which the prior conviction was based. In addition, the trial court instructed the jury to disregard any information concerning the case other than that elicited at the trial.

We find Mayberry has failed to show substantial prejudice to his right to a fair trial and hold the trial court did not abuse its discretion in denying the motion for mistrial.

Mayberry contends the district court erred in failing to discharge the jury panel, which included only one black person. He alleges selection of the jury panel solely from a list of registered driver's license holders constitutes knowing and purposeful discrimination and fails to provide a jury drawn from a fair cross-section of the community. This argument is without merit.

K.S.A. 43-162 provides that jury lists shall be prepared from voter registration records, lists of licensed drivers, lists of non-driver's identification cards, or census records. At trial, the district court judge recognized that Reno County was in the process of combining the voter registration and driver's license lists, but that defendant's jury panel was randomly selected from only the driver's license list because computer programming had not been completed.

Clearly, the jury panel method of selection utilized by Reno County was within the statutory mandates of K.S.A. 43-162. In addition, we find Mayberry has failed to show that a recognizable and identifiable class, otherwise entitled to be jurors, was purposefully and systematically excluded from jury service. *United States v. Bennett,* 539 F.2d 45, 55 (10th Cir.), *cert. denied* 429 U.S. 925 (1976); *State v. Reeves,* 234 Kan. 250, 252-53, 671 P.2d 553 (1983). Failure to include the name of every qualified person does not provide grounds for reversal of a conviction, and the United States Constitution does not require a supplemental source of potential juror names merely because an identifiable group registers to vote or obtains driver's licenses in a proportion lower than the rest of the population. *United States v. Evans,* 542 F.2d 805, 812 (10th Cir. 1976), *cert. denied* 429 U.S. 1101 (1977); See *State v. Brothers,* 212 Kan. 187, 189, 510 P.2d 608 (1973); *Lopez v. State,* 415 So. 2d 1204, 1209 (Ala. Crim. App. 1982).

Mayberry's final contention concerning impartiality of the jury is the argument the trial court committed reversible error in

refusing to dismiss jurors challenged for cause. He argues four jurors and an alternate with knowledge of his prior murder conviction should have been dismissed for cause.

K.S.A. 22-3410(2)(i) provides that a potential juror may be challenged for cause where his or her state of mind with reference to the case or parties prevents the juror from acting impartially and without prejudice to the substantial rights of any party. Determining the qualifications of a potential juror is within the sound discretion of the trial court and will not be disturbed absent a showing of prejudice. *In re Estate of Minney*, 216 Kan. 178, 184, 531 P.2d 52 (1975).

During voir dire, Mayberry challenged all potential jurors for cause who possessed information of his prior murder conviction. The challenge was denied for all but one of the potential jurors. Mayberry proceeded to exercise peremptory challenges to strike three potential jurors who possessed the challenged information but also utilized the peremptory challenges to strike persons without the prior conviction information. Thus, four jurors and one alternate who were challenged for cause and could have been peremptorily challenged actually sat on the jury.

We find no error in the trial court's overruling of Mayberry's challenges for cause. The entire jury panel was subjected to extensive voir dire and individuals with any outside information were individually questioned by the trial judge. The four jurors who were challenged for cause and actually sat on the jury clearly expressed their ability to disregard outside information. In addition, any error committed by the trial court in failing to discharge the challenged jurors could easily have been cured by Mayberry's use of peremptory challenges. See *Ross v. Oklahoma*, 487 U.S. 81, 88, 101 L. Ed. 2d 80, 108 S. Ct. 2273, *reh. denied* 487 U.S. 1250 (1988); *State v. Paxton*, 201 Kan. 353, 358-59, 440 P.2d 650, *cert. denied* 393 U.S. 849 (1968). Mayberry failed to utilize his peremptory challenges to strike the challenged jurors. Since no argument is made that use of the peremptory challenges on the four knowledgeable jurors would have made Mayberry accept other objectionable jurors, we find he has no grounds for complaint.

Mayberry was not prejudiced by the information possessed by the jury and there is no showing of abuse by the trial court in failing to discharge jurors challenged for cause.

The next issue we consider is Mayberry's assertion the trial court abused its discretion in admitting into evidence photographs of the slain victim and the crime scene. He argues the prejudicial effect of these photographs far outweighs the probative value they offer.

Four photographs were admitted into evidence over the defendant's objection that depicted the bloody crime scene. The photographs, used by a KBI forensic examiner for bloodstain and directionality analysis, revealed close-up shots of bloodstains and the point of impact by shotgun pellets. Four other photographs were also admitted into evidence over Mayberry's objection. These photographs were used by the coroner to explain the cause and method of death. The photographs show the victim lying in bed with a massive head wound.

The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Prouse,* 244 Kan. 292, 294, 767 P.2d 1308 (1989); *State v. Lucas,* 243 Kan. 462, 476-77, 759 P.2d 90 (1988). Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. *State v. Boyd,* 216 Kan. 373, 377, 532 P.2d 1064 (1975). Nevertheless, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. Thus, in *Ruebke,* photographs of three victims mutilated by shotgun wounds were found admissible as tending to prove or disprove material facts. 240 Kan. at 516-17.

In the present case, the cause and method of death were not really in dispute. The coroner and several police officers testified the victim clearly died from a close-range shotgun blast to the top half of her head. The photographs utilized by the forensic examiner and coroner, however, were used to show the victim died while still in bed, thus indicating the murder was premeditated. However, one photograph could have served that purpose. The introduction of four gruesome photographs constitutes

undue repetition even though the evidence had a reasonable tendency to prove a material fact. We admonish trial courts to be sensitive to the possibility of prejudice which can flow from such inflammatory evidence. However, we do not believe the admission of the photographs in this case rises to the level of abuse of discretion.

Mayberry next contends the trial court erroneously admitted hearsay testimony which was prejudicial and diminished his credibility as a witness.

At the trial, several of Long's friends testified to conversations they held with Long in the days preceding her murder. Essentially, these witnesses all testified that Long claimed to be having problems in her relationship with Mayberry. Brandi Henks stated that Long told her she retrieved Mayberry's key to her residence because she did not like getting hit. Lisa Griffith spoke with Long the day before the murder and was told that Long had broken up with Mayberry. Later that day, Long called Griffith crying and upset because Mayberry had hit her. Several others testified that Long said she had fought with Mayberry and he had hit her.

Mayberry's assertion the testimony consisted of inadmissible hearsay is meritless. Evidence of a statement which is made other than by a witness testifying constitutes inadmissible hearsay. K.S.A. 1990 Supp. 60-460. On numerous occasions, this court has approved admission of statements by the deceased which demonstrate the deceased's state of mind prior to the murder and show the existence of a rift between the deceased and defendant. *State v. Wood*, 230 Kan. 477, 479, 638 P.2d 908 (1982); *State v. Phipps*, 224 Kan. 158, 160, 578 P.2d 709 (1978). As a general rule, in the case of marital homicide, evidence of a discordant marital relationship and the defendant's previous ill treatment of the spouse is relevant as bearing on the defendant's motive and intent. *State v. Taylor*, 234 Kan. 401, 408, 673 P.2d 1140 (1983); *State v. Fenton*, 228 Kan. 658, 667-68, 620 P.2d 813 (1980).

In *State v. Wood*, we held that testimony by the murder victim's mother that the victim stated the defendant had beaten her was not inadmissible hearsay, but constituted relevant evidence concerning intent. 230 Kan. at 478-80.

The testimony presented in the case at hand was not inadmissible hearsay because it was not introduced to prove the truth of the matter asserted. Rather, the testimony was properly admitted to show Long's state of mind the day preceding her murder and the fact that a discordant relationship existed between Long and Mayberry. The testimony showed the relationship which existed between Long and Mayberry and the conduct of·that relationship. Thus, we find no error in admission of the testimony.

Next, Mayberry asserts the trial court committed reversible error in failing to instruct the jury on the lesser included offense of second-degree murder. The trial court denied Mayberry's request for an instruction on second-degree murder on the basis that the evidence presented supported a finding either of first-degree premeditated murder or of acquittal. Mayberry argues the jury could have reasonably inferred the murder occurred without premeditation since there was no direct evidence of such.

K.S.A. 21-3107(3) requires the trial court to instruct on all lesser crimes upon which the defendant might reasonably be convicted. Instructions on lesser included offenses must be given even if the evidence is weak and inconclusive and consists solely of the defendant's testimony. *State v. Hill,* 242 Kan. 68, 73, 744 P.2d 1228 (1987). The affirmative duty to instruct arises, however, only where there is evidence under which the defendant may reasonably be convicted of the lesser crime. *State v. Bishop,* 240 Kan. 647, 654-55, 732 P.2d 765 (1987). Thus, before instructions on lesser included offenses are required there must be positive testimony presented by the defense to prove a version of the homicide contrary to the version presented by the State. *State v. Garcia,* 233 Kan. 589, 608-09, 664 P.2d 1343 (1983). See *State v. Armstrong,* 240 Kan. 446, 460, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987). When no evidence is introduced to indicate a lesser included offense has been committed, there is no error in failing to instruct on the lesser included offense. *State v. King,* 219 Kan. 508, 514, 548 P.2d 803 (1976).

Second-degree murder, K.S.A. 21-3402, is clearly a lesser included offense of first-degree murder, K.S.A. 21-3401. All the elements of second-degree murder are included within first-degree murder. First-degree murder, however, contains the additional element of premeditation.

Mayberry argues all evidence of premeditation presented at trial was circumstantial. He asserts there was no evidence which linked the cut telephone wire and damaged door lock to the shooting. In addition, he alleges evidence that he purchased a shotgun the day prior to Long's murder is not conclusive evidence of premeditation. Finally, Mayberry contends the manner of death is also inconclusive evidence of premeditation because there is no evidence of what events occurred at the time of the shooting, and the jury could infer the perpetrator of the crime did not become angered until the time of the shooting.

We disagree with Mayberry's arguments. The sole issue at trial was the identity of the perpetrator, and Mayberry's only theory of defense was that he was not involved in the murder. Premeditation may be established by circumstantial evidence and can be inferred from the established circumstances. *State v. Hill*, 233 Kan. 648, 652, 664 P.2d 840 (1983).

Evidence presented showed that Mayberry and the victim had a stormy relationship which the victim believed had ended. There was no evidence the attack was provoked, as the victim was killed by a close-range shotgun blast while sitting in bed. Although no murder weapon was discovered, testimony established that Mayberry had purchased a shotgun and shells the very day preceding the victim's murder. We find, from the evidence presented, the jury could reasonably have concluded the murder was premeditated.

As for Mayberry's theory that the killing may have occurred in a fit of anger, we recognize that no such theory or evidence in support thereof was presented at trial. Mayberry's theory is mere conjecture and without substance to require an instruction on second-degree murder. Speculation and guesswork do not constitute the minimum evidence required to support a conviction. *State v. Burnison*, 247 Kan. 19, 28, 795 P.2d 32 (1990); *State v. White & Stewart*, 225 Kan. 87, 99, 587 P.2d 1259 (1978). Under the facts presented, we find there was no affirmative duty to instruct on second-degree murder and affirm the trial court's ruling.

Next, Mayberry alleges the trial court erroneously enhanced the convictions for first-degree murder and aggravated burglary.

He contends the sentences were not enhanceable under K.S.A. 1989 Supp. 21-4504(a).

At the time Mayberry. committed the murder and aggravated burglary, May 4, 1989, K.S.A. 21-4504 was in effect. Under the habitual criminal statute, the trial court was authorized to double the maximum sentence of a defendant convicted of ·*any* felony. Subsequent to commission of the crimes, but prior to the trial and sentencing of Mayberry, K.S.A. 1989 Supp. 21-4504 became effective on July 1, 1989. The amended statute provides:

"(a) If a defendant is convicted of a felony specified in article 34, 35 or 36 of chapter 21 of Kansas Statutes Annotated a second time, the punishment for which is confinement in the custody of the secretary of corrections, the trial judge may sentence the defendant as follows, upon motion of the prosecuting attorney:

"(1) The court may fix a minimum sentence of not less than the least nor more than twice the greatest minimum sentence authorized by K.S.A. 21-4501 and amendments thereto, for the crime for which the defendant is convicted; and

"(2) the court may fix a maximum sentence of not less than the least nor more than twice the greatest maximum sentence provided by K.S.A. 21-4501 and amendments thereto, for the crime."

Mayberry contends application of K.S.A. 1989 Supp. 21-4504 prevents enhancement of his sentences because aggravated burglary, an article 37 felony, is not within the statute's scope. He also alleges the second-degree murder conviction under K.S.A. 21-402 (Corrick), upon which the sentence enhancements were predicated, falls outside the scope of K.S.A. 1989 Supp. 21-4504.

Mayberry's arguments are misplaced. Criminal statutes and penalties in effect at the time of the criminal offense are controlling. See *State v. Sylva,* 248 Kan. 118, Syl. ¶ 4, 804 P.2d 967 (1991); *State v. Ramos,* 240 Kan. 485, 490, 731 P.2d 837 (1987); *State v. Armstrong,* 238 Kan. 559, 566, 712 P.2d 1258 (1986). Since the crimes were committed prior to the effective date of K.S.A. 1989 Supp. 21-4504, we find the sentences imposed were properly enhanced.

For his final argument, Mayberry contends the trial court abused its discretion in expressing its preference for the death sentence if it were available.

It is a well-settled rule of law that a sentence imposed by the trial court will not be disturbed on the ground it is excessive,

provided it is within the statutory limits and is not the result of partiality, prejudice, oppression, or corrupt motive. *State v. Doile,* 244 Kan. 493, 503-04, 769 P.2d 666 (1989); *State v. Dunn,* 243 Kan. 414, 434, 758 P.2d 718 (1988). The two consecutive life sentences imposed for murder and the 10- to 40-year sentence imposed for aggravated burglary are clearly within statutory limitations. Given the violent nature of the crime committed and Mayberry's prior conviction for second-degree murder, we find no abuse of discretion in imposing the maximum sentences. The district court's gratuitous statement of preference for the death penalty does not, of itself, constitute abuse of discretion.

The judgment of the trial court is affirmed.